**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiff***

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE THOMAS, on behalf of herself, all others similarly situated, and the general public, <br><br> Plaintiff, <br><br> v. <br><br> NURTURE, INC., <br><br> Defendant. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> **CAL. BUS. & PROF. CODE §§17500** *et seq.*; <br> **CAL. BUS. & PROF. CODE §§17200** *et seq.*; <br> **CAL. CIV. CODE §§ 1750** *et seq.*; **and** <br> **BREACH OF EXPRESS & IMPLIED WARRANTIES** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Michelle Thomas, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendant Nurture, Inc., d/b/a Happy Family Brands ("Nurture"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.  Nurture markets and sells snack products for infants and toddlers, including the three product lines challenged here: (1) "Happy Baby organic greek yogis," (2) "Happy Baby organic creamies" (freeze dried snacks for infants as young as 7 months) (the "Happy Baby Snacks"), and (3) "Happy Tot Pouches," for infants as young as 12 months (collectively the "Baby/Tot Snacks"). Directly on the labeling of the Baby/Tot Snacks, Nurture represents expressly or implicitly that the products are healthy, meaning beneficial rather than detrimental to physical health. These representations, however, are false or at least highly misleading because the Baby/Tot Snacks contain high amounts of free and added sugar, which causes metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is especially harmful to infants and toddlers.

2.  Plaintiff brings this action against Nurture on behalf of herself, other similarly-situated consumers, and the general public, to enjoin Nurture from deceptively marketing the Baby/Tot Snacks as healthy, and to recover compensation for injured class members.

## THE PARTIES

3.  Plaintiff Michelle Thomas is a resident of California.

4.  Defendant Nurture Inc. is a Delaware corporation with its principal place of business in New York.[1]

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of

---

[1] Nurture, which does business as Happy Family Brands, was founded in 2003 in New York. The Company launched its first products in 2006. By 2010, Nurture grew to more than $13 million in sales. By the end of 2012, it employed more than 70 people and had products available for sale in more than 14,000 stores and 30 countries. In May 2013, Danone, a multinational food-products corporation based in Paris, acquired a 92% stake in the company.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from Nurture. In addition, more than two-thirds of the members of the class reside in states other than the state in which Nurture is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

6.     The Court has personal jurisdiction over Nurture pursuant to Cal. Code Civ. P. § 410.10, as a result of Nurture's substantial, continuous, and systematic contacts with the State, and because Nurture has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by distributing and selling the Baby/Tot Snacks in California.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Nurture resides in (*i.e.*, is subject to personal jurisdiction in) this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

8.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to either the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claim occurred in Contra Costa County.

## FACTS

## I.     NURTURE MARKETS THE BABY/TOT SNACKS AS PROMOTING HEALTH AND WELLBEING

9.     During the Class Period defined herein, Nurture has marketed the Baby/Tot Snacks with various health and wellness messages, including at least the following statements:

- "We are a team of Real Parents, Pediatricians & Nutritionists on a mission to bring health and happiness to our little ones and the planet"

- "Our team creates nutritious meals and snacks"

- "Enlightened Nutrition Philosophy"

- "Healthy start"

- "Super food"

- "Helps support your tot's immune system"

1

2

3

- "Helps support digestive system"

- "Gives your tot important nutrients to help support a healthy brain"

- "wholesome veggies"

4

5

6

10.     These statements, which are targeted at parents, expressly or implicitly convey the message that the Baby/Tot Snacks are healthy choices, that is, the types of foods that, if consumed regularly, will not detriment health.

7

8

11.     Nurture knows or has reason to know consumers of the Baby/Tot Snacks are likely to regard these representations as important in making purchasing decisions.

9

10

12.     Examples of Nurture's health and wellness representations on the labels of some of the Baby/Tot Snacks appear below.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28










## II.   EXCESSIVE SUGAR CONSUMPTION IS HARMFUL TO HEALTH, ESPECIALLY IN CHILDREN

### A.   Whether "Added" or "Free," the Sugar in the Baby/Tot Snacks Acts Physiologically Similar

13.   "Added sugars" include sugars added to foods during processing or preparation, such as brown sugar, sucrose, honey, invert sugar, molasses, and fruit juice concentrates, but under some definitions (like the FDA's), do not include naturally-occurring sugars present in intact fruits, vegetables, and dairy products and—as relevant here—in juiced or pureed fruits and vegetables.

14.   "Free sugars," on the other hand (for example, as used by the World Health Organization (WHO)), definitionally excludes only sugars naturally occurring in *intact* fruits, vegetables, or dairy products, and so includes sugars from juiced or pureed fruits and vegetables. Thus, the definitional "distinction between added and free sugars is that the latter includes all naturally occurring sugars in nonintact (i.e., juiced or pureed) fruit and vegetables."[2]

15.   Thus, added sugars are a subset of free sugars. Put another way, all added sugars are free sugars, though not all free sugars are added sugars.

16.   This is, however, merely semantical. "The existence of these different ways of classifying sugars in foods and beverages in authoritative dietary guidance and nutrition communication implies that the distinctions are deemed to be physiologically relevant. But physiologic differentiation between these classes [of sugars] arise[s] mainly from effects of the [food] matrix in which the sugars are found. For example, it has often been shown that the acute metabolic impact is lower and satiety effects greater for intact fruit than for the comparable fruit juices, the latter having effects more similar to other sugar-sweetened beverages (SSBs)."[3]

17.   The food matrix, as defined by the USDA, is "the nutrient and non-nutrient components of foods and their molecular relationships, i.e., chemical bonds, to each other."[4] The food matrix may be viewed

---

[2] Mela, Daid J. et al., "Perspective: Total, Added, or Free? What Kind of Sugars Should We Be Talking About?" Adv. Nutr. 2018 Mar.; 9(2): 63-69 (Apr. 7, 2018) ["Sugar Perspective"].

[3] *Id.*

[4] https://agclass.nal.usda.gov/mtwdk.exe?k=default&l=60&s=5&t=2&w=17240.

as a physical domain that contains and/or interacts with specific constituents of a food (e.g., a nutrient) providing functionalities and behaviors which are different from those exhibited by the components in isolation or a free state. It is, quite literally, the physical geometry of the food. The effect of the food matrix (FM-effect) has profound implications in food processing, oral processing, satiation, and satiety, and, most relevant here, digestion in the gastrointestinal tract.[5] In short, the FM-effect means that two foods of identical chemical composition, but with different structures, may have significantly different outcomes for health.

18.     By way of example, a whole apple can be consumed in at least three different ways: whole (as found in nature), pureed into apple "sauce," and liquified into apple juice. Assuming no loss of matter from the processing, the calories will remain the same from that apple. But because of the food matrix implications, consuming the apple in the three different ways will have very different physiological effects.

19.     When comparing the glycemic excursion of these three "forms" of apple, the pureed form— apple sauce—is much more akin to apple juice than it is to an apple in whole form. This is true, even though the fiber is still technically present, because its food matrix has been destroyed in the pureeing. As a result, it is much healthier to consume a whole apple than it is to consume the same number of calories in puree or juice form. And because of the negative health effects of consuming added or free sugars, an apple, while perhaps a healthy food choice when it is whole, is transformed into a decidedly *un*healthy food once processed into juice or puree. [6] Thus, "the term 'free sugars' best conveys the nature and sources of dietary sugars that are most consistently related to risks of positive energy balance, and that are also associated with diabetes and dental caries."[7]

20.     This is why feeding infants and toddlers "pureed baby food" sets them up for "cognitive and medical problems."[8] "When intact, the fiber of Real Food," like whole fruits, "does the double duty in both protecting the liver and feeding the gut. The best fiber is the combination of both soluble and insoluble fiber,

---

[5] Aguilera, J, "The food matrix: implications in processing, nutrition and health," Crit. Rev. Food Sci. Nutr. 2019; 59(22) 3612-3629 (September 10, 2018).

[6] *See* Mela, Sugar Perspective, *supra* n.2.

[7] *Id.*

[8] Robert H. Lustig, *Metabolical*, at 238.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

and that's pretty much anything that comes out of the ground—until it's processed."[9] The processing of whole fruits into the Happy Baby and Happy Tot purees results in the destruction of all of the fruits' insoluble fiber. Thus, while whole fruit "demonstrates protection" from disease, "[s]tudies of juice consumption show increased risk of diabetes and heart disease even after controlling for calories."[10] Pureeing fruit causes the insoluble fiber to be "sheer[ed] . . . to smithereens," resulting in a food that no longer "protect[s] the liver from the onslaught of the sugar . . . ."[11]

21.     All of the Baby/Tot Snacks contain free sugars, and for several, this includes added sugars.

**B.      Because of the Compelling Evidence that Consuming Free Sugar is Unhealthy, Especially in Young Children, Authoritative Bodies Recommend Avoiding or Limiting its Consumption, Including Specifically from Puree Products**

22.     Recognizing that "[p]ureeing foods means much of the intrinsic sugar (within cell walls of fruit and vegetables) is liberated and readily available," the WHO—while endorsing the consumption of whole fruits and vegetables—has stated that "pureed foods" "sold in pouches with spouts present[] several issues[,]" including "exposure to high concentrations of free sugars that may quickly be absorbed," "lower nutrient density," and "issues with sucking directly from the pouches," such as "t[oo]th decay" from "sucking these [sugary] foods across the teeth."[12]

23.     Because pureed pouches have "low nutrient/energy density[] and high free-sugar content," WHO concluded they "may not provide the appropriate supplementary nutrition required for healthy growth and development,"[13] and advised "food producers" to "reduce the total- and free-sugar contents of foods" and to "phase out pouches with spouts . . . ."[14]

24.     Ultimately, the WHO said food manufacturers "should not provide excess nutrients of public

---

[9] *Id.* at 259.

[10] *Id.*

[11] *Id.* at 260.

[12] World Health Organization, "Ending inappropriate promotion of commercially available complementary foods for infants and young children between 6 and 36 months in Europe," at pp. 47-48 (2019) [hereinafter "WHO Discussion Paper"].

[13] *Id.* at pp. xi-xii.

[14] *Id.* at p. 10.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

health concern, such as free sugars," "recommend[ed] limiting intake of free sugars to less than 10% (ideally 5%) of total energy intake," and recommended that free sugars be wholly avoided by children under two.[15]

25.     The World Medical Association similarly "advocate[s] for healthy sustainable food with limited free sugar intake that is less than 5% total energy intake" because a "high level of free sugar consumption has been associated with [non-communicable diseases]."[16]

26.     The First Steps Nutrition Trust in the United Kingdom recommends foods limit the use of pureed fruit to ≤ 5% of total weight to "reduce total exposure of infants and young children to intrinsic sugars liberated from fruit and vegetable cell walls."[17] Research shows that "[t]he total added and free sugar contents of baby foods are of great concern" based on the link between "free sugar," like that found in the Baby/Tot Snacks, "to later health status, including development of dental caries, weight gain and increased risk of non-communicable diseases, such as type 2 diabetes, cardiovascular diseases, some cancers and non-alcoholic fatty liver disease."[18]

27.     The Dietary Guidelines for Americans 2020-2025 recommends that children "younger than age 2" completely "[a]void foods and beverages with added sugars" and state that, for all others, "[a] healthy dietary pattern limits added sugars to less than 10 percent of calories per day."[19]

28.     The American Heart Association (AHA) examined the cardiovascular health effects of added sugars on children and found that "it is reasonable to recommend that children consume ≤ 25 g (100 cal or ≈ 6 teaspoons) of added sugars per day and to avoid added sugars for children <2 years of age.[20]

---

[15] *Id.* at p. 28.

[16] World Medical Association Statement on Free Sugar Consumption and Sugar-Sweetened Beverages at 2, 4 (Oct. 2019).

[17] Hutchinson, J., et al., "High sugar content of European commercial baby foods and proposed updates to existing recommendations," Matern Child Nutr. 2021 Jan; 17(1): e13020 (August 30, 2020).

[18] *Id.* (citations omitted).

[19] U.S. Dep't of Agriculture & U.S. Dep't of Health & Human Servs., *Dietary Guidelines for Americans, 2020-2025*, at 18, 53 (9th ed. Dec. 2020), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf.

[20] Vos, M.B., et al., "Added Sugars and Cardiovascular Disease Risk in Children: A Scientific Statement From the American Heart Association" (Aug. 22, 2016).

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

**C.**    **There is Substantial Scientific Evidence that Excess Free Sugar Consumption Causes Numerous Chronic Diseases**

   **i.**    **Metabolic Syndrome**

29.    "Metabolic syndrome comprises a cluster of cardiovascular risk factors (hypertension, altered glucose metabolism, dyslipidemia, and abdominal obesity) that occur in obese children. However, metabolic syndrome can also occur in lean individuals, suggesting that obesity is a marker for the syndrome, not a cause."[21]

30.    Excess consumption of free sugar leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of fructose can overwhelm the liver, which metabolizes fructose. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[22]

31.    Metabolic disease has also been linked to type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease.

32.    More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[23]

33.    In a 2016 study, researchers looked at 43 obese children, ages 8 to 19, with at least one other co-morbidity demonstrating metabolic problems. All were high consumers of free or added sugar in their diets. Because the researchers did not want to give subjects sugar to see if they got sick, they instead took

---

[21] Ram Weiss, Andrew A. Bremer, and Robert H. Lustig, "What is metabolic syndrome, and why are children getting it?" Ann. N.Y. ACAD. SCI. 1281, 123–140, 123 (2013).

[22] Te Morenga, L., et al., "Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies," *BJM* (January 2013) [hereinafter, "Te Morenga, Dietary Sugars & Body Weight"].

[23] Fried, S.K., "Sugars, hypertriglyceridemia, and cardiovascular disease," *American Journal of Clinical Nutrition*, Vol. 78 (suppl.), 873S-80S, at 873S (2003) [hereinafter, "Fried, Hypertriglyceridemia"].

sugar away from those who were already sick to see if they got well. The researchers designed the study to be isocaloric, by giving back to subjects the same number of calories in starch that were taken away in sugar. Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant. In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, by just removing free sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.[24]

34.     "Childhood obesity is a serious problem in the United States, putting children and adolescents at risk for poor health." According to the Center for Disease Control and Prevention, in 2017-2018, obesity prevalence was 13.4% among 2- to 5-year-olds.[25] Childhood obesity is associated with insulin resistance, abnormal glucose metabolism, elevated BP, dyslipidemia, inflammation, and compromised vascular function—all components of metabolic syndrome.[26]

35.     Excess free sugar consumption also leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess weight can then exacerbate the problems of excess sugar consumption because excess fat, particularly around the waist, is in itself a primary cause of insulin resistance, another vicious cycle. Studies have shown that belly fat produces hormones and other substances that can cause insulin resistance, high blood pressure, abnormal cholesterol levels, and cardiovascular disease. And belly fat plays a part in the development of chronic inflammation in the body, which can cause damage over time without any signs or symptoms. Complex interactions in fat tissue draw immune cells to the area, which triggers low-level chronic inflammation. This in turn contributes even more to insulin resistance, type 2 diabetes, and cardiovascular disease—all of which compromise the

---

[24] Robert H. Lustig, et al., "Isocaloric Fructose Restriction and Metabolic Improvement in Children with Obesity and Metabolic Syndrome," *Pediatric Obesity*, Vol. 24, No. 2 (Feb. 2016).

[25] Center for Disease Control and Prevention, Childhood Obesity Facts Prevalence of Childhood Obesity in the United States, *available at* https://www.cdc.gov/obesity/data/childhood.html.

[26] *Id.* at 125.

immune system.

36.     Free sugar consumption is also associated with increased risk of high blood triglycerides and abnormal cholesterol levels.

37.     Cholesterol is a waxy, fat-like substance found in the body's cells, used to make hormones, bile acids, vitamin D, and other substances. The human body manufactures all the cholesterol it requires, which circulates in the bloodstream in packages called lipoproteins. Excess cholesterol in the bloodstream can become trapped in artery walls, building into plaque and narrowing blood vessels, making them less flexible, a condition called atherosclerosis. When this happens in the coronary arteries, it restricts oxygen and nutrients to the heart, causing chest pain or angina. When cholesterol-rich plaques in these arteries burst, a clot can form, blocking blood flow and causing a heart attack.

38.     Most blood cholesterol is low-density lipoprotein, or LDL cholesterol, which is sometimes called "bad" cholesterol because it carries cholesterol to the body's tissues and arteries, increasing the risk of heart disease. High-density lipoprotein, or HDL cholesterol, is sometimes called "good" cholesterol because it removes excess cholesterol from the cardiovascular system, bringing it to the liver for removal. Thus, a low level of HDL cholesterol increases the risk of heart disease.

39.     Diet affects blood cholesterol. For example, the body reacts to saturated fat by producing LDL cholesterol.

40.     When the liver is overwhelmed by large doses of fructose, one of the elements of free sugar, it will convert excess to fat, which is stored in the liver and then released into the bloodstream, contributing to key elements of metabolic syndrome, like high blood fat and triglycerides, high total cholesterol, and low HDL "good" cholesterol.[27]

41.     In a cross-sectional study of normal weight and overweight children aged 6-14, researchers found that "the only dietary factor that was a significant predictor of LDL particle size was total fructose intake."[28]

42.     A systematic review and meta-analysis of 37 randomized controlled trials concerning the link

---

[27] Te Morenga, Dietary Sugars & Body Weight, *supra* n.22.

[28] Aeberli, I., et al., "Fructose intake is a predictor of LDL particle size in overweight schoolchildren," *American Journal of Clinical Nutrition*, Vol. 86, 1174-78 (2007).

between sugar intake and blood pressure and lipids found that higher sugar intakes, compared to lower sugar intakes, significantly raised triglyceride concentrations, total cholesterol, and low density lipoprotein cholesterol.[29]

43.     A cross-sectional study among more than 6,100 U.S. adults from the NHANES 1999-2006 data were grouped into quintiles for sugar intake as follows: (1) less than 5% of calories consumed from sugar, (2) 5% to less than 10%, (3) 10% to less than 17.5%, (4) 17.5% to less than 25%, and (5) 25% or more. These groups had the following adjusted mean HDL levels (because HDL is the "good" cholesterol, higher levels are better): 58.7 mg/dL, 57.5, 53.7, 51.0, and 47.7. Mean triglyceride levels were 105 mg/dL, 102, 111, 113, and 114. Mean LDL levels were 116 mg/dL, 115, 118, 121, and 123 among women, with no significant trend among men. Consumers whose sugar intake accounted for more than 10% of calories had a 50% - 300% higher risk of low HDL levels compared to those who consumed less than 5% of calories from sugar. Likewise, high-sugar consumers had greater risk of high triglycerides. All relationships were linear as demonstrated in the charts below.[30]



**Figure 1.** Multivariable-Adjusted Mean HDL-C Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006



**Figure 2.** Multivariable-Adjusted Geometric Mean Triglyceride Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006



**Figure 3.** Multivariable-Adjusted Mean LDL-C Levels by Level of Added Sugar Intake Among US Men and Women, NHANES 1999-2006

[29] Te Morenga, L., et al., "Dietary sugars and cardiometabolic risk: systematic review and meta-analyses of randomized controlled trials on the effects on blood pressure and lipids," *American Journal of Clinical Nutrition*, Vol. 100, No. 1, 65-79 (May 7, 2014).

[30] Welsh, J.A., et al., "Caloric Sweetener Consumption and Dyslipidemia Among US Adults," *Journal of the American Medical Association*, Vol. 303, No. 15, 1490-97 (April 21, 2010).

44.     One experimental study showed that, when a 17% fructose diet was provided to healthy men, they showed an increase in plasma triacylglycerol concentrations of 32%.[31]

45.     Another 10-week experimental feeding study showed that those who were fed 25% of their energy requirements as fructose experienced increases in LDL cholesterol, small dense LDL cholesterol, and oxidized LDL cholesterol, as well as increased concentrations of triglycerides and total cholesterol, while those fed a 25% diet of glucose did not experience the same adverse effects.[32]

46.     In addition to harming blood cholesterol levels, free sugar consumption is associated with an increased risk of hypertension. In one study, for example, 15 healthy men drank 500 ml water containing either no sugar, 60 grams of fructose, or 60 grams of glucose. Blood pressure, metabolic rate, and autonomic nervous system activity were measured for 2 hours. While the administration of fructose was associated with an increase in both systolic and diastolic blood pressure, blood pressure did not rise in response to either water or glucose ingestion, as demonstrated in the chart below.[33]



Fig. 1. Time course of the systolic blood pressure (SBP, A), diastolic blood pressure (DBP, B), and heart rate (HR, C) changes (left) and mean responses (right) to drinking water (□), glucose (▲), and fructose (■). *P < 0.05 and **P < 0.01, statistically significant differences over time from baseline values (left) and differences between responses to the drinks (right).

[31] Bantle, J.P., et al., "Effects of dietary fructose on plasma lipids in healthy subjects," *American Journal of Clinical Nutrition*, Vol. 72, 1128-34 (2000).

[32] Stanhope, K.L., et al., "Consuming fructose-sweetened, not glucose-sweetened, beverages increases visceral adiposity and lipids and decreases insulin sensitivity in overweight/obese humans," *The Journal of Clinical Investigation*, Vol. 119, No. 5, 1322-34 (May 2009).

[33] Brown, C.M., et al., "Fructose ingestion acutely elevates blood pressure in healthy young humans," *Am. J. Physiol. Regul. Integr. Compl. Physiol.*, Vol. 294, R730-37 (2008).

47.     In another study, more than 40 overweight men and women were supplemented for 10 weeks with either sucrose or artificial sweeteners. The sucrose group saw an increase in systolic and diastolic blood pressure, of 3.8 and 4.1 mm Hg, respectively, while the artificial sweetener group saw a decrease in systolic and diastolic blood pressure, of 3.1 and 1.2 mm Hg, respectively.[34]

### ii.     Cardiovascular Heart Disease

48.     Heart disease is the number one killer in the United States. The scientific literature demonstrates that consumption of free sugar has deleterious effects on heart health, even in children.

49.     In a study published in January 2020, researchers set out to determine whether consumption of sugar-containing beverages (SCB) is associated with cardiometabolic risk (CMR) in preschool children, using data from 2007-2018 from TARGet Kids!, a primary-care, practice-based research network in Canada. After adjusting for sociodemographic, familial and child-related covariates, higher consumption of SCB was significantly associated with elevated CMR scores, including lower HDL "good" cholesterol, and higher triglycerides. The researchers stated that their "findings support recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[35]

### iii.     Nonalcoholic Fatty Liver Disease

50.     Sugar consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[36]

51.     Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose

---

[34] Raben A, Vasilaras TH, Møller AC, Astrup A, "Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects" Am. J. Clin. Nutr., Vol. 76(4), 721-9 (2002).

[35] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool children." Prev. Med. Reports 17 (Jan. 14, 2020).

[36] Farrell, G.C., et al., "Nonalcoholic fatty liver disease: from steatosis to cirrhosis," *Hepatology*, Vol. 433, No. 2 (Suppl. 1), S99-S112 (February 2006); Powell, E.E., et al., "The Natural History of Nonalcoholic Steatohepatitis: A Follow-up Study of Forty-two Patients for Up to 21 Years," *Hepatology*, Vol. 11, No. 1 (1990).

consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[37]

52.     Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing for the first time alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[38]

### iv.     Inflammation

53.     Inflammation has been associated with type 2 diabetes, myocardial infarction, and stroke, as well as weight gain and obesity.[39]

54.     A 10-week study comparing a group whose sucrose (*i.e.*, sugar) intake was increased by 151% to a group whose intake was decreased by 42% showed the former's blood concentration of the biological markers for inflammation—haptoglobin, transferrin, and C- reactive protein—increased by 13%, 5%, and 6%, respectively, while the latter group's concentrations decreased by 16%, 2%, and 26% respectively.[40]

55.     In a prospective, randomized, controlled crossover trial, 29 subjects were studied over six 3-week interventions in which they either consumed various amounts of fructose, glucose, or sucrose, or received dietary advice to consume low amounts of fructose. The study showed LDL particle size reduction (associated with atherosclerosis) by 0.51 nm after high-fructose intake (80 grams per day), and by 0.43 nm

---

[37] Charlton, M.R., et al., "Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States," *Gastroenterology*, Vol. 141, No. 4, 1249-53 (October 2011).

[38] Lindback, S.M., et al., "Pediatric Nonalcoholic Fatty Liver Disease: A Comprehensive Review," *Advances in Pediatrics*, Vol. 57, No. 1, 85-140 (2010); Lazo, M. et al., "The Epidemiology of Nonalcoholic Fatty Liver Disease: A Global Perspective," *Seminars in Liver Disease*, Vol. 28, No. 4, 339-50 (2008); Schwimmer, J.B., et al., "Prevalence of Fatty Liver in Children and Adolescents," *Pediatrics*, Vol. 118, No. 4, 1388-93 (2006); Browning, J.D., et al., "Prevalence of hepatic steatosis in an urban population in the United States: Impact of ethnicity," *Hepatology*, Vol. 40, No. 6, 1387-95 (2004).

[39] Sorensen, L.B., et al., "Effect of sucrose on inflammatory markers in overweight humans," *American Journal of Clinical Nutrition*, Vol. 82, 421-27 (2005) (citations omitted) [hereinafter, "Sorensen, Inflammatory Markers"]; *see also* Pearson, T.A., et al., "Markers of Inflammation and Cardiovascular Disease: Application to Clinical and Public Health Practice, A Statement for Healthcare Professionals From the Centers for Disease Control and Prevention and the American Heart Association," *Circulation*, Vol. 107, 499-511 (2003).

[40] Sorensen, Inflammatory Markers, *supra* n.39.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

after high-sucrose intake (also 80 grams per day). It also found significant increases in fasting glucose and C-reactive protein, leading the authors to conclude that the "data show potentially harmful effects of low to moderate consumption of SSBs on markers of cardiovascular risk such as LDL particles, fasting glucose, and [C-reactive protein] within just 3 wk in healthy young men, which is of particular significance for young consumers."[41]

56.     Another intervention study investigated the effect of a diet with a high content of sucrose or artificial sweeteners on the inflammatory markers including haptoglobin, and transferrin in overweight subjects. During the intervention, sucrose intake increased by 151% in the sucrose group and decreased by 42% in the sweetener group, resulting in a 1.6-kg weight gain in the sucrose group and a 1.2-kg weight loss in the sweetener group over 10 wk ($P < 0.001$). Concentrations of haptoglobin, transferrin, and CRP increased by 13%, 5%, and 6%, respectively, in the sucrose group and decreased by 16%, 2%, and 26%, respectively, in the sweetener group (between-group differences: $P = 0.006$, $P = 0.01$, and $P = 0.1$, respectively). This showed that a high consumption of sugar-sweetened foods and drinks increased haptoglobin and transferrin, which are inflammatory markers.[42]

### v.     Dental Caries

57.     Dental caries (cavities) is considered humanity's most prevalent disease, affecting 35% of the global population.[43] The average number of permanent decayed, missing, and filled teeth among 12-year-olds has been estimated at 2.3.[44] In the United States, 1 in 5 people of any age suffer from tooth decay.[45]

58.     Sugar consumption is considered the one and only root cause of cavities. Though often

---

[41] Aeberli, I., et al., "Low to moderate sugar-sweetened beverage consumption impairs glucose and lipid metabolism and promotes inflammation in healthy young men: a randomized controlled trial," *American Journal of Clinical Nutrition*, Vol. 94, 479-85 (2011).

[42] Sørensen LB, et al., "Effect of sucrose on inflammatory markers in overweight humans." AM J CLIN NUTR., 82(2):421-7 (2005).

[43] Marcenes W, Kassebaum NJ, Bernabé E, et al. "Global burden of oral conditions in 1990-2010: a systematic analysis" *J. Dent. Res.* Vol. 92(7) 592-7 (2013).

[44] Sheiham A, Williams DM, Weyant RJ, et al. "Billions with oral disease: A global health crisis--a call to action" *J. Am. Dent. Assoc.*146(12), 861-4 (2015).

[45] Meier T, Deumelandt P, Christen O, Stangl GI, Riedel K, Langer M., "Global Burden of Sugar-Related Dental Diseases in 168 Countries and Corresponding Health Care Costs," *J. Dent. Res.* Vol. 96(8), 845-854 (2017).

referred to as a multifactorial condition, the other factors sometimes cited—other carbohydrates, oral microorganisms, salivary flow, fluoride, and dental hygiene—appear to just have mitigating influences, simply modifying the speed by which sugar causes cavities. Without sugars, the chain of causation is broken, and the disease does not occur. The evidence is considered overwhelming that sugar is the single specific case of the worldwide caries epidemic.[46]

59.     Studies decades ago showed that in countries where sugar consumption was very low, dental caries was almost non-existent,[47] and new analyses show that the life-long burden of cavities increases as sugar intakes increase from zero percent.[48]

60.     The American Academy of Pediatric Dentistry has recommended sugar intake stay below 5% for children and adolescents.[49] This is similar to where sugar consumption dropped during U.N. sanctions in Iraq, which corresponded to a halving of cavity rates among children.[50]

61.     Other researchers have recommended keeping sugar intake below 3% to avoid cavities.[51] Because there appears to be an exponential increase in cavity rates for sugar intakes even starting as low as 1% of calories, almost any amount of sugar increases risk of dental caries.[52]

---

[46] Sheiham A, James WP, "Diet and Dental Caries: The Pivotal Role of Free Sugars Reemphasized," *J. Dent. Res.*, Vol. 94(10), 1341-7 (2015). [hereinafter "Sheiham et al., Diet and Dental Caries"].

[47] Sheiham A, James WP, "A new understanding of the relationship between sugars, dental caries and fluoride use: implications for limits on sugars consumption," *Public Health Nutr.*, Vol. 17(10), 2176-84 (2014). [hereinafter "Sheiham et al., Sugars, Dental Caries, and Fluoride Use"].

[48] Sheiham A, James WP, "A reappraisal of the quantitative relationship between sugar intake and dental caries: the need for new criteria for developing goals for sugar intake," *BMC Public Health*, Vol. 14, 863 (2014) [hereinafter "Sheiham et al, Reappraisal of the Quantitative Relationship Between Sugar Intake and Dental Caries"].

[49] *Policy on Dietary Recommendations for Infants, Children and Adolescents*, Reference Manual of American Academy of Pediatric Dentistry, Vol. 39(6), 64-6 (2017). [hereinafter "Policy on Dietary Recommendations"].

[50] Sheiham et al., Sugars, Dental Caries, and Fluoride Use, *supra* n.47.

[51] Kmietowicz Z. *Reduce sugar intake to 3% to protect against tooth decay, say researchers.* B.M.J. Vol. 349, g5622 (2014) [hereinafter "Kmietowicz, Reduce Sugar Intake to 3%"].

[52] Sheiham et al., Diet and Dental Caries, *supra* n.46.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

**D.** **Replacing Whole Foods with Purees Leads to Weakened Mastication Muscles, Increasing Risk of Obesity and Metabolic Syndrome**

62.      Before the modern era of processed foods, infants would be weened on whole foods, which they gummed and chewed, thereby strengthening the mastication muscles to prepare them for eating more solid foods and less breastmilk. Weening infants on purees rather than whole foods deprives them of this essential muscle building, resulting in weakened mastication muscles, which in turn leads to an increased risk of sleep apnea, obesity, and metabolic syndrome.[53]

63.      Additionally, "allowing infants to suck from the pouch is not recommended" because it "does not encourage the learning of, and use of, chewing skills," does not encourage "develop[ment] [of] fine motor skills when picking up food or playing with it," especially since "[p]uréed fruit and vegetables in pouches are high in free sugars, and sucking these foods across the teeth may contribute to tooth decay."[54]

## III.      NURTURE'S REPRESENTATIONS THAT THE BABY/TOT SNACKS ARE HEALTHY, AND ITS OMISSION OF MATERIAL INFORMATION, ARE DECEPTIVE

64.      Each challenged product contains a high amount of free sugar. Specifically, more than 25% of the calories in the Happy Baby Snacks come from added sugars, and up to 64% of their calories come from free sugars. Similarly, between 30% and 63% of the Happy Tot Pouches' calories come from free sugars.

65.      Because scientific evidence demonstrates that consumption of excess free sugar, like that contained in the Baby/Tot Snacks, causes metabolic syndrome, type 2 diabetes, cardiovascular heart disease, liver disease, and dental caries, among other morbidity, Nurture's labeling statements stating or suggesting that the Baby/Tot Snacks are healthy are literally false, or at least highly misleading.

66.      In representing that the Baby/Tot Snacks are healthy, Nurture regularly and intentionally omits material information regarding the dangers of the sugars in its products. Nurture is under a duty to disclose this information to consumers because (a) Nurture is revealing *some* information about the Baby/Tot Snacks—enough to suggest they are healthy—without revealing additional material information, (b) Nurture's deceptive omissions concern human health, and specifically the detrimental health consequences

---

[53] *Metabolical* at pp. 237-38, *supra*, n.8.

[54] WHO Discussion Paper at 48, s*upra* n.12.

of consuming the Baby/Tot Snacks, (c) Nurture was in a superior position to know of the dangers presented by the sugars in the Baby/Tot Snacks, as it is a food company whose business depends upon food science and policy, and (d) Nurture actively concealed material facts not known to Plaintiff and the Class.

## IV.   NURTURE'S HEALTH AND WELLNESS REPRESENTATIONS VIOLATE STATE AND FEDERAL REGULATIONS

67.   The health and wellness claims on the labels of the Baby/Tot Snacks violate FDA food labeling regulations, which have been adopted as California's labeling regulations pursuant to the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875 *et seq.* (the "Sherman Law"). *See id.* §§ 110660, 110665 & 110670.

68.   In addition, Nurture's labels stating or suggesting the Baby/Tot Snacks are healthy "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming them, including, among other things, increased risk of metabolic syndrome, heart disease, type 2 diabetes, liver disease, and dental caries.

69.   Finally, in making its health and wellness statements, Nurture failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Nurture failed to disclose the increased risk of serious chronic disease and death likely to result from consumption of the Baby/Tot Snacks.

### PLAINTIFF'S RELIANCE & INJURY

70.   During the Class Period, Plaintiff Michelle Thomas was a frequent purchaser of both Nurture Inc.'s Happy Baby Snacks and Happy Tot Pouches. To the best of her recollection, her purchases included Happy Baby Yogis and Happy Tot Pouches, including Super Foods, Love My Veggies, Super Smart, and Fiber & Protein varieties. Ms. Thomas made her purchases from local stores including the Walmart in Pittsburg, California.

71.   In making her purchase decisions, she believes she read and relied on the Challenged Claims identified herein that conveyed that the Happy Baby/Tot Snacks are healthy, including at least: "We are a team of Real Parents, Pediatricians & Nutritionists on a mission to bring health and happiness to our little

ones and the planet," "Our team creates nutritious meals and snacks," "Enlightened Nutrition Philosophy," "Healthy start" "wholesome veggies,"  and "Super food," "Helps support your tot's immune system," "Helps support digestive system," and "Gives your tot important nutrients to help support a healthy brain."

72.     When purchasing the Baby/Tot Snacks, Ms. Thomas was seeking products that were healthy for her child. However, Nurture's representations that the Baby/Tot Snacks are healthy were false or at least highly misleading, and had the capacity, tendency, and likelihood to confuse or confound Plaintiff and other consumers acting reasonably (including the Class) because, as described in detail herein, consumption of the free sugars in the Baby/Tot Snacks is associated with increased risk of disease.

73.     Plaintiff is not a nutritionist or food scientist, but rather a lay consumer who did not have the specialized knowledge Nurture had regarding the physiological effects of consuming the Baby/Tot Snacks. At the time of purchase, Plaintiff was unaware of the extent to which consuming the free sugars in the Baby/Tot Snacks might increase the risk of disease. Plaintiff acted reasonably in relying on Nurture's marketing, which Nurture intentionally placed on the Baby/Tot Snacks' labeling to induce average consumers into purchasing the products, and knowing that the statements would be important to such consumers in making purchasing decisions—especially because those products are for their children's consumption.

74.     The Baby/Tot Snacks cost more than similar products without misleading labeling and would have cost less absent the misleading health and wellness claims and omissions of material information alleged herein. If Nurture were enjoined from making the misleading claims, the market demand and price for the products would drop, as it has been artificially and fraudulently inflated due to Nurture's use of the deceptive labeling.

75.     Plaintiff paid more for the Baby/Tot Snacks, and would only have been willing to pay less, or unwilling to purchase them at all, absent the misleading labeling statements and omissions complained of herein. Class Members likewise paid more for the Baby/Tot Snacks than they otherwise would have paid. For these reasons, the Baby/Tot Snacks were worth less than what Plaintiff and the Class paid for them. As a result, Plaintiff lost money as a result of Nurture's deceptive claims and practices in that she did not receive what she paid for when purchasing the Baby/Tot Snacks.

76.     Because the snack products are usually only needed for a few years of a child's life, after

which many consumers will no longer be in the market for the Baby/Tot Snacks, Nurture's conduct is capable of repetition yet evading review.

77.     The duration of the harm to Plaintiff and other Class members is too short to be fully litigated before the harm ceases and there is a reasonable expectation that the harm will occur again if Nurture remains free to market the Baby/Tot Snacks as the type of product that is beneficial rather than detrimental to health if regularly consumed.

78.     Plaintiff's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

79.     Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a Class of all persons who, on or after April 22, 2018 (the "Class Period") purchased in California, for household use and not for resale or distribution, one or more of the challenged Baby/Tot Snacks.

80.     Plaintiff nevertheless reserves the right to divide into subclasses, expand, narrow, more precisely define, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

81.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

82.     Questions of law and fact common to Plaintiff and the Class (Fed. R. Civ. P. 23(a)(2)) include, without limitation:

a.     Whether the challenged labeling claims and omissions are material.

b.     Whether the challenged labeling claims and omissions are likely to mislead a reasonable consumer in light of the scientific evidence of the health effects of consuming the free sugars contained in the Baby/Tot Snacks.

c.     Whether Nurture's conduct violated the California's Consumer protection statutes, the Federal Food, Drug, and Cosmetic Act, and its implementing regulations, the California Sherman Food, Drug, and Cosmetic Law, or any other regulation, statute, or law.

d.     Whether, through the challenged labels, Nurture made affirmations of fact or promises, or descriptions of the goods, whether they became part of the basis of the bargain, and

1    whether Nurture failed to provide goods in conformation with them.

2         e.     The proper equitable and injunctive relief.

3         f.     The proper amount of damages, restitution or disgorgement.

4         g.     The proper amount of reasonable litigation expenses and attorneys' fees.

5    83.    Plaintiff's claims are typical of Class members' claims in that they are based on the same

6    underlying facts, events, and circumstances relating to Nurture's conduct.

7    84.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no

8    interests incompatible with the interests of the Class, and has retained counsel competent and experienced in

9    class action, consumer protection, and false advertising litigation, including within the food industry.

10   85.    Class treatment is superior to other options for resolution of the controversy because the relief

11   sought for each Class member is small such that, absent representative litigation, it would be infeasible for

12   Class members to redress the wrongs done to them.

13   86.    Questions of law and fact common to the Class predominate over any questions affecting only

14   individual Class members.

15   87.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2),

16   and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

17                                 **CAUSES OF ACTION**

18                              **FIRST CAUSE OF ACTION**

19            **VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW,**

20                 **CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.***

21   88.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

22   fully herein.

23   89.    Under the FAL, "[i]t is unlawful for any person, firm, corporation or association, or any

24   employee thereof with intent directly or indirectly to dispose of real or personal property or to perform

25   services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the

26   exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

27   90.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Nurture relating

28   to its labeling the Baby/Tot Snacks was and is likely to mislead consumers acting reasonably.

91.     Plaintiff suffered injury in fact as a result of Nurture's actions as set forth herein because Plaintiff purchased the Baby/Tot Snacks in reliance on Nurture's false and misleading health and wellness statements.

92.     Nurture's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Nurture has advertised the Baby/Tot Snacks in a manner that is untrue and misleading, which Nurture knew or reasonably should have known.

93.     Nurture profited from its sales of the falsely and deceptively advertised Nurture Products to unwary consumers.

94.     As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and the Class are entitled to injunctive and equitable relief and restitution.

95.     Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code, and because restitution more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT,

## CAL. CIV. CODE §§ 1750 *ET SEQ.*

96.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

97.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

98.     Nurture's false and misleading labeling and other policies, acts, and practices described herein were designed to, and did induce the purchase and use of the Baby/Tot Snacks for personal, family, or household purposes by Plaintiff and other Class members, and violated and continues to violate at least the following sections of the CLRA:

a.      § 1770(a)(5): Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities which they do not have;

b.      § 1770(a)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

c.      § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): Representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

99.     Nurture profited from its sales of the falsely, deceptively, and unlawfully advertised the Baby/Tot Snacks to unwary consumers.

100.    Nurture's wrongful business practices regarding the Baby/Tot Snacks constituted, and constitute, a continuing course of conduct in violation of the CLRA.

101.    In compliance with Cal. Civ. Code § 1782, Plaintiff sent written notice to Nurture of her claims, but Nurture has failed, after 30 days, to satisfy Plaintiff's demand or to rectify the behavior. Accordingly, Plaintiff, on behalf of herself and the Class, seeks injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

102.    In compliance with Cal. Civ. Code § 1782(d), an affidavit of venue is filed concurrently herewith.

103.    Because these claims are subject to a three-year statute of limitations, while Plaintiff's claims for restitution under the UCL are subject to a four-year statute of limitations, and because Plaintiff's claims under the UCL's "unfair" and "unlawful" prongs are subject to different elements and standards, Plaintiff's legal remedies under the CLRA are inadequate to fully compensate Plaintiff and other Class Members for all of Nurture's challenged behavior.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

## CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*

104.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

105.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200.

**Fraudulent**

106.   Nurture's representations that the Baby/Tot Snacks are healthy or otherwise beneficial to physical health are likely to deceive reasonable consumers in light of the scientific evidence that regular consumption of excessive free sugar, like in the Baby/Tot Snacks, causes disease.

**Unlawful**

107.   The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

a.   The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

b.   The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; and

c.   The Federal Food, Drug, and Cosmetic Act, 28 U.S.C. §§ 301 *et seq.*, and its implementing regulations, 21 C.F.R. §§ 101 *et seq.*; and

d.   The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.*

108.   Because Plaintiff's claims under the "unlawful" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Nurture's challenged behavior.

**Unfair**

109.   Nurture's conduct with respect to the manufacturing, labeling, advertising, and sale of the Baby/Tot Snacks was unfair because Nurture's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, did not outweigh the gravity of the harm to its victims.

110.   Nurture's conduct with respect to the manufacturing, labeling, advertising, and sale of the Baby/Tot Snacks was also unfair because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the Federal Food, Drug, and Cosmetic Act, and the California False Advertising Law.

111.   Nurture's conduct with respect to the manufacturing, labeling, advertising, and sale of the Baby/Tot Snacks was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

112.     Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Nurture's challenged behavior.

*          *          *

113.     Nurture profited from its sale of the falsely, deceptively, unlawfully, and unfairly advertised Baby/Tot Snacks to unwary consumers.

114.     Plaintiff and other Class Members are likely to be damaged by Nurture's deceptive trade practices, as Nurture continues to disseminate, and is otherwise free to continue to disseminate false and misleading information. Thus, injunctive relief enjoining its deceptive practices is proper.

115.     Nurture's conduct caused and continues to cause substantial injury to Plaintiff and other Class members, who have suffered injury in fact as a result of Nurture's fraudulent, unlawful, and unfair conduct.

116.     In accordance with Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself, the Class, and the general public, seeks an order enjoining Nurture from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

117.     Plaintiff, on behalf of herself and the Class also seeks an order for the restitution of all monies from the sale of the Baby/Tot Snacks that Nurture unjustly acquired through acts of unlawful competition.

**FOURTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

**CAL. COM. CODE § 2313**

118.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

119.     Through the labels of the Baby/Tots Snacks, Nurture made affirmations of fact or promises, and made descriptions of goods, which formed part of the basis of the bargain, in that Plaintiff and the Class purchased the products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

120.     These affirmations and descriptions include:

- "Our team creates nutritious meals and snacks"
- "Healthy start"
- "Super food"

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

- "Helps support your tot's immune system"

- "Helps support digestive system"

- "Gives your tot important nutrients to help support a healthy brain"

- "wholesome veggies"

121.    Nurture breached its express warranties by selling products that do not meet the above affirmations, promises, and product descriptions because they are not healthy, but in fact present increased risk of obesity, liver disease, and high cholesterol.

122.    That breach actually and proximately caused Plaintiff and the Class injury in the form of the lost purchase price they paid for the Baby/Tots Snacks bearing these representations.

123.    Plaintiff notified Nurture of the breach prior to filing the lawsuit and prior to asserting a claim for breach of warranty, but Nurture failed to rectify the breach.

124.    As a result, Plaintiff seeks, on behalf of herself and other Class members, actual damages arising as a result of Nurture's breaches of express warranty.

## FIFTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## CAL. COM. CODE § 2314

125.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

126.    Nurture, through its acts and omissions set forth herein, in the sale, marketing and promotion of the Baby/Tots Snacks bearing health and wellness statements, made representations to Plaintiff and the class that, among other things, the products are healthy. Plaintiff and the class bought the Baby/Tots Snacks bearing health and wellness claims manufactured, advertised, and sold by Nurture as described herein.

127.    Nurture is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was, in the sale to Plaintiff and other consumers, an implied warranty that those goods were merchantable.

128.    However, Nurture breached that implied warranty in that the Baby/Tots Snacks are not healthy, as set forth in detail herein.

129.    As an actual and proximate result of Nurture's conduct, Plaintiff and the class did not receive

27

goods as impliedly warranted by Nurture to be merchantable, in that they did not conform to promises and affirmations made on the container or label of the goods. *See* Cal. Com. Code § 2314(2)(f).

130.    Plaintiff notified Nurture of the breach prior to filing the lawsuit and prior to asserting a claim for breach, but Nurture failed to rectify the breach.

131.    As a result, Plaintiff seeks, on behalf of herself and other class members, actual damages arising as a result of Nurture's breaches of implied warranty.

## **PRAYER FOR RELIEF**

132.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against Nurture as to each and every cause of action, and the following remedies:

a.    An Order certifying this as a class action, appointing Plaintiff and her counsel to represent the class, and requiring Nurture to pay the costs of class notice;

b.    An Order enjoining Nurture from labeling, advertising, or packaging the Baby/Tots Snacks with the challenged health claims identified herein;

c.    An Order enjoining Nurture's practice of marketing the Baby/Tots Snacks with misleading claims;

d.    An Order requiring Nurture to pay restitution to restore funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the UCL, FAL, or CLRA;

e.    An Order requiring Nurture to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

f.    An Order requiring Nurture to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

g.    Pre- and post-judgment interest;

h.    Costs, expenses, and reasonable attorneys' fees; and

i.    Any other and further relief the Court deems necessary, just, or proper.

## **JURY DEMAND**

133.    Plaintiff hereby demands a trial by jury on all issues so triable.

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT

Dated: April 22, 2022

/s/ Paul K. Joseph

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
Fax: (619) 331-2943

***Counsel for Plaintiff***

*Thomas v. Nurture, Inc.*
CLASS ACTION COMPLAINT